Filed 11/13/14  In re M.Y. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re M.Y., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D065356 |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1079C) |
| v. | |
| H.P., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Tahra C. Broderson, Deputy County Counsel, for Plaintiff and Respondent.

Dependency Legal Group of San Diego and Manuel Ramon "Ray" Diaz for Minor.

In this child dependency case, we review orders denying a mother's Welfare and Institutions Code section 388[1] petition to modify an earlier order terminating reunification services and terminating her parental rights under section 366.26. The subject of these proceedings, M.Y., was taken into the custody of plaintiff and respondent San Diego County Health and Human Services Agency (the agency) at the age of 17 months as a result of a series of violent domestic altercations between the child's mother, defendant and appellant H.P. (mother), and the child's father, R.Y. (father). Reunification services were terminated when M.Y. was 32 months old because the parents had made no progress in dealing with their violent relationship. The juvenile court denied mother's petition to modify because it found that, notwithstanding her testimony to contrary, she continued to engage in conflict with father. The juvenile court found that M.Y. was adoptable and rejected mother's contention that she had a beneficial relationship with M.Y. within the meaning of section 366.26, subdivision (c)(1)(B)(i). Accordingly, the court terminated mother's and father's parental rights. Mother filed a timely notice of appeal.

The juvenile court's orders are supported by substantial evidence of continuing serious conflict between mother and father, M.Y.'s adoptability, and the absence of a relationship with M.Y. which, notwithstanding mother's failure to reunify, would justify continuing her parental rights. Accordingly, we affirm the juvenile court's orders.

---

1       All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Petition*

M.Y. was born in November 2010. At that time, mother and father were living together with mother's other two children, P.P., age 6, and H.C., age 4.

On five occasions between August 2011 and April 2012, law enforcement was called to the apartment where the family lived with mother's mother to investigate reports of domestic violence and spousal battery. On April 8, 2012, mother was arrested after she hit father three times and threw candles at his face. According to father, mother's arrest occurred after she "'jabbed me with her fingers about four or five times in the back . . . cursed and screamed at me in front of our child . . . picked up three tea light candles from the counter and threw them at my face.'" In support of an application for a restraining order, father filed a declaration in which he stated that "'[i]n around February or March 2012, [mother] and I got into an argument and she punched me in the neck, spit on my face, and cursed at me while I was carrying [M.Y.] . . . [Mother] is verbally and physically abusive towards me in front of our child and I am extremely concerned for [M.Y.'s] safety and my own.'"

M.Y.'s sister, P.P., reported that mother and father fought "'with words and with hands'" about three times a week and appeared to her to be "'trying to beat each other.'" M.Y.'s brother, H.C., stated that he saw mother throw a lotion bottle at father and that it left a gash on father's head. The apartment manager where the family lived stated that mother has one of "'the most volatile tempers I have ever seen.'"

3

Although immediately following the April 8, 2012 altercation both mother and father signed a safety plan which required that they have no contact with each other, shortly thereafter a social worker discovered that they were in contact with each other and that father had decided not to pursue a restraining order but instead hoped to reconcile with mother and help her regain custody of her children. Thereafter, the agency filed a petition alleging that M.Y., P.P. and H.C. were dependents within the meaning of section 300, subdivision (b), by virtue of the fact that their parents had failed or were unable to protect them.

The juvenile court sustained all three petitions and placed M.Y. in the custody of father's mother, P.P. in the custody of her father and H.C. in the custody of his father. The juvenile court further ordered reunification services for mother and father.

B. *Reunification*

At a review hearing held in M.Y.'s case in December 2012, an agency social worker reported that although mother and father had made progress in dealing with conflicts in their relationship and had engaged in counseling, father's mother reported incidents which suggested that mother and father continued to engage in physical altercations and substance abuse.

At the 12-month review hearing in M.Y.'s case, which was held on July 26, 2013, a social worker reported receiving evidence that mother and father were continuing to engage in physical conflict as well as substance abuse. The social worker had obtained a series of incident reports from the San Diego Police Department which indicated that the

4

police had been repeatedly called to the residence they shared over reports of physical conflict between mother and her landlord and mother and father. The social worker also reported she had been contacted by mother's cousin who expressed concern about M.Y.'s safety if he was returned to mother's care. The cousin reported her suspicion that both mother and father were using methamphetamine. Finally, the social worker reported that at a safety mapping meeting the agency had arranged, mother walked out after she and father admitted they had lied to the social worker about the status of their relationship. Although they had told the social worker that they had broken up, they were in fact together and admitted they had lied to make it easier to get M.Y. back.

In light of the continuing conflict and instability in mother's and father's lives, the agency recommended that reunification services be terminated and that a permanent planning hearing under section 366.26 be set. The juvenile court agreed with the agency's recommendation and, on July 26, 2013, it terminated reunification services and set a section 366.26 hearing.

C. *Petition to Modify*

The agency learned that on September 14, 2013, mother and father were engaged in another incident of domestic violence that involved a response by the San Diego Police Department. The incident occurred at a gym where father worked. According to father, he often spent nights at the gym and mother would visit him there. Father reported that, on September 14, mother came to the gym. She was looking at his computer and discovered what she thought was evidence he was flirting with other women. Father told

5

police that mother slapped him multiple times, threw his tools around the room and, when he walked away, threw a hammer at him.

By the time police arrived, mother had left the scene but kept calling father while he was talking to the police officer. The police officer spoke with mother on father's phone; she reported that when she discovered father's flirting, she decided to break up with father. She claimed that he would not let her leave and that he threw clothes around and tried to keep her keys and phone.

Although mother reported to the social worker that she had broken up with father, on September 30, 2013, the social worker saw her in a car in a parking lot adjacent to the gym where father worked.

Notwithstanding her continuing conflicts with father and evidence their relationship was continuing, on December 9, 2013, mother filed a petition to modify the order terminating reunification services and setting the section 366.26 hearing. In the petition, mother asserted that she had completed a parenting class and an anger management class. She also indicated that she been sober since July 2013 and that she had continued individual therapy. In support of her petition, mother submitted reports from her therapist, who believed she was making progress, and from a psychologist who had performed a bonding study.

At the January 22, 2014 hearing on her petition to modify, mother testified and admitted that she had previously lied to social workers about her use of methamphetamine but that she had been attending Narcotics Anonymous meetings

6

regularly and had been sober since July 2013. Mother also stated that she did not have any contact with father in the three months before the September 2013 incident and that she had gone to his place of employment that day only because he owed her some money. She further testified that father made unwanted advances and that he would not let her leave. She explained that on September 30, she was near the gym where father worked because she was homeless at that time and wanted to take a shower at the gym.

The juvenile court denied the petition to modify largely because it found mother's testimony not credible and no changed circumstance with respect to the repeated domestic violence between mother and father. The juvenile court stated: "With respect to domestic violence, I do not find that it's -- that changed circumstances have been demonstrated. I rely in large measure on . . . my observations of mother's testimony on the stand, which I find incredible. Her explanations of the incident on September 14th[] and my observations of her physical demeanor on cross-examination suggest[] that she was not being truthful with the court." The juvenile court found that mother was not only untruthful about the September 14 incident but also about her later appearance near the gym where father worked: "But what is particularly concerning, vis-a-vis the domestic violence, is that when just a short time before there is this very negative contact on the 14th, where mother ascribes to father all of these manipulative and damaging behaviors, including, apparently, restraining her and not allowing her to leave, by her version. And her -- that's her thought process would allow her to go back. And not only that, but on the stand she's somewhat smug and -- and defiant about it, that she needed to take a

7

shower. That was her choice. And, essentially, almost that she would do it again. And that is what really is concerning to the court is what I observed on the stand."

Although the juvenile court conceded that mother was making changes with respect to obtaining parenting information, employment and a stable home, "with respect to domestic violence, which is the crux of the protective issue here, I do not find that there's been demonstrated by a preponderance of the evidence a change in circumstances."

D. *Termination of Parental Rights*

The agency presented evidence that M.Y.'s paternal grandparents, who had been caring for him for almost two years, were willing to adopt him, and, further that, given his overall developmental characteristics, good health and relatively young age, there were more than 100 families in the community who would be interested in adopting him.

For her part, mother presented evidence that she had been visiting M.Y. on a regular basis and a bonding study which showed that M.Y. had a bond with both mother and his caregivers. Father did not contest the agency's recommendation that his parental rights be terminated.

The juvenile court found that M.Y. was adoptable and that mother's bond with him was not sufficient to outweigh the benefit of placing him in a permanent adoptive home. Accordingly, the juvenile court terminated mother's and father's parental rights.

Mother filed a timely notice of appeal.[2]

---

[2]    M.Y.'s counsel has filed a brief that joins in the arguments made by the agency. Father has not appeared in this appeal.

DISCUSSION

I

In her first argument on appeal, mother contends that she presented unrebutted evidence she was sober and had addressed her history of domestic violence and that the juvenile court therefore abused its discretion failing to give her relief under section 388. We find no abuse of discretion.

On her petition for relief under section 388, mother bore the burden of proving that, in light of changed circumstances, M.Y.'s best interests would be served by modifying the juvenile court's prior order. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) As the agency points out, we review the juvenile court's determination under section 388 for abuse of discretion, and its decision will not be disturbed unless it was arbitrary, capricious or patently absurd. (*In re Stephanie M.*, at p. 318.) As the parties concede, we review the juvenile court's factual findings for substantial evidence and have no power "'to judge the effect or value of, or to weigh the evidence; to consider the credibility of witnesses; or to resolve conflicts in, or make inferences or deductions from the evidence.'" (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.)

The record here fully supports the juvenile court's determination that mother's history of domestic violence was the principal protective issue with respect to her ability to act as M.Y.'s parent. The record also fully supports the juvenile court's determination that mother failed to show any material change of circumstance on that critical issue. The continuing nature of the problem is evident not only in the September 14 violent

9

confrontation, and the September 30 sighting near father's place of employment, but also in the juvenile court's striking and binding appraisal of mother's credibility and the concerns that her continuing untruthfulness raise. In considering M.Y.'s best interests, the continuing incidents of domestic violence and untruthfulness far outweigh mother's commendable efforts to educate herself, stay sober, and maintain contact with her son. (See *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532.) Thus, on this record, we find no abuse of discretion in the juvenile court's determination that mother failed to meet her burden under section 388.

## II

With respect to the juvenile court's order terminating her parental rights, mother argues that she established a beneficial bond with M.Y. within the meaning of section 366.26, subdivision (c)(1)(B)(i) and that the juvenile court therefore erred in terminating her parental rights. We find no error.

Where, as here, reunification services have been terminated and the dependent child is adoptable, the Legislature has expressed a strong preference that parental rights be terminated and the child be made available for adoption. (See § 366.26, subd. (c)(1).) The Legislature has provided an exception to this statutory preference when the record shows compelling reason to find termination would be detrimental to the child, the parent has maintained regular visitation and the child would benefit from continuing the parental relationship. (§ 366.26, subd. (c)(1)(B)(i).) As we stated in *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575, this exception arises only when the parental relationship "promotes

10

the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."

Here, the bonding study mother relies upon showed that M.Y. was bonded to both his mother and his caregivers. Like the juvenile court, we also note that at the time of the hearing, M.Y. had spent most of his young life in the care of his grandparents. Under these circumstances, the juvenile court was fully warranted in determining that mother's relationship with M.Y. would not provide him with the benefits of a permanent placement either with his paternal grandparents or another stable adoptive home.

## DISPOSITION

The orders appealed from are affirmed.

BENKE, Acting P. J.

WE CONCUR:

HALLER, J.

O'ROURKE, J.

11